No. 99-114

IN THE SUPREME COURT OF THE STATE OF MONTANA

2000 MT 218

MICHAEL LAUDERT,

Petitioner and Appellant,

v.

RICHLAND COUNTY SHERIFF'S DEPARTMENT

and the HUMAN RIGHTS COMMISSION OF THE

STATE OF MONTANA,

Respondents and Respondents.

APPEAL FROM: District Court of the First Judicial District,

In and for the County of Lewis and Clark,

The Honorable Dorothy McCarter, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Barbara E. Bell, Bell & Marra, pllc, Great Falls, Montana

E. June Lord, Attorney at Law, Great Falls, Montana


For Respondents:

Virginia Bryan, Wright, Tolliver, & Guthals, P.C., Billings, Montana

Mike Weber, Attorney at Law, Sidney, Montana

(Richland County Sheriff's Deparment)

Patrick A. Trammelle, Montana Department of Labor & Industry,

Helena, Montana

(Montana Human Rights Commission)

For Amicus:

Timothy C. Kelly, Attorney at Law, Emigrant, Montana

(Montana Trial Lawyers Association)

Submitted on Briefs: October 21, 1999

Decided: August 11, 2000

Filed:

_____

Clerk

Justice Jim Regnier delivered the opinion of the Court.

¶1 Michael Laudert appeals from the Decision and Order of the First Judicial District Court, Lewis and Clark County, affirming the decision of the Montana Human Rights Commission and denying Laudert's request for attorney fees. We affirm in part, reverse in part, and remand for proceedings consistent with this opinion.

¶2 This appeal raises the following issues:

¶3 1. Whether the District Court erred in applying the *McDonnell Douglas* test?

¶4 2. Whether the District Court erred in affirming the hearing examiner's denial of Laudert's request for compensatory damages?

¶ 3. Whether the District Court erred in denying Laudert's claim for attorney fees?

## BACKGROUND

¶6 Richland County Sheriff's Department ("RCSD") hired Laudert on September 1, 1985. In 1986 Laudert began experiencing gastric bleeds caused by liver dysfunction. This bleeding continued for the duration of his employment. In approximately August 1990 Laudert experienced a massive bleed which required him to be evacuated to a hospital in Billings. By September 1990 he had used up all of his accumulated leave and was forced to resign. In November 1990 doctors at the University of Minnesota recommended that he undergo a transplant operation. Laudert underwent a successful liver transplant in September 1991.

¶7 In 1992 Laudert discovered that the person hired by RCSD to replace him would be quitting. Laudert spoke with Sheriff Don Tiffany about returning to work at RCSD and was informed by Sheriff Tiffany that he would have to apply for the position with the other job applicants. Laudert interviewed for the position in February 1992. RCSD interviewed seven other applicants.

¶8 Prior to Laudert's interview, Deputy Russell Glaeske approached Laudert in a supermarket and questioned him regarding his transplant. Glaeske expressed concern about Laudert's physical ability to handle the job and indicated that he did not believe that Laudert could withstand a blow to the stomach. Glaeske made these comments despite the fact that Laudert had provided RCSD with a full medical release from his physician affirming that he could return to work without restriction. Deputy Glaeske was a member of the four-person panel that interviewed the job applicants. During his interview, Laudert initiated a discussion regarding Glaeske's concerns about his liver transplant. Laudert testified that Glaeske maintained his belief that Laudert could not handle the job because of his transplant.

¶9 The four panelists independently rated the applicants. Of the eight applicants, Laudert received the lowest interview rating, while J. C. Rankin received the highest rating. RCSD hired Rankin for the position.

¶10 Laudert filed a Charge of Discrimination with the Montana Human Rights Commission on August 12, 1992, alleging that the RCSD had unlawfully discriminated against him in an employment decision on the basis of his age and disability. On July 15,

1994, the Commission certified Laudert's complaint for a contested case hearing. A contested case hearing was held on July 24-26 and August 19, 1996.

¶11 Hearing Examiner Terry Spear issued a decision on March 3, 1997. The hearing examiner found that RCSD had considered Laudert's disability by questioning him about his liver disease and transplant during his interview. Accordingly, the examiner ordered RCSD to submit a written policy regarding hiring procedures which included specific guidelines regarding future inquiry into applicant disabilities. However, the examiner did not award damages to Laudert because the examiner found that RCSD would not have hired Laudert even in the absence of any unlawful consideration of his disability.

¶12 Laudert filed exceptions to the hearing examiner's decision with the Montana Human Rights Commission contending that the hearing examiner should have awarded him damages and that the hearing examiner applied the wrong standard of proof to RCSD's affirmative defense that they would not have hired Laudert regardless of his disability. On November 20, 1997, the commission issued an order affirming the hearing examiner's decision.

¶13 On December 19, 1997, Laudert filed a Petition for Judicial Review and for Attorneys' Fees & Costs with the First Judicial District Court, Lewis and Clark County, contending that the commission erred in affirming the hearing examiner's decision and seeking attorney fees and costs pursuant to § 49-2-505(7), MCA. On February 2, 1999, the District Court issued its Decision and Order affirming the final decision of the commission and denying Laudert's request for attorney fees and costs. Laudert appeals.

## STANDARD OF REVIEW

¶14 A district court reviews an administrative decision in a contested case to determine whether the findings of fact are clearly erroneous and whether the agency correctly applied the law. *See Hearing Aid Inst. v. Rasmussen* (1993), 258 Mont. 367, 371-72, 852 P.2d 628, 631; *see also* § 2-4-704, MCA. We employ the same standards when reviewing a district court order affirming or reversing an administrative decision. *See Langager v. Crazy Creek Prod., Inc.*, 1998 MT 44, ¶ 13, 287 Mont. 445, ¶ 13, 954 P.2d 1169, ¶ 13.

## ISSUE ONE

¶15 Whether the District Court erred in applying the *McDonnell Douglas* test?

¶16 The hearing examiner found that the questions which members of the interview panel asked Laudert during his interview were "direct evidence" that RCSD unlawfully considered his disability. RCSD contended that it did not hire Laudert because of his employment history. On this basis, the hearing examiner concluded that Laudert had established a "mixed motive" case. The Montana Human Rights Commission affirmed.

¶17 On review, the District Court concluded that our decision in *European Health Spa v. Human Rights Commission* (1984), 212 Mont. 319, 687 P.2d 1029, precluded it from applying the "mixed motive" approach used by the hearing examiner. Instead, the court attempted to review the hearing examiner's decision using the approach of *McDonnell Douglas Corp. v. Green* (1973), 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668. In applying the *McDonnell Douglas* approach to uphold the hearing examiner's order, the District Court reached some seemingly inconsistent conclusions. The court affirmed the hearing examiner's finding that Laudert proved that RCSD had relied, in part, on his disability in deciding not to hire him, but the court also concluded the Laudert failed to prove that the RCSD's nondiscriminatory reasons for not hiring him were pretextual. Clearly, the District Court was struggling to reach the correct result by attempting to fit a case of mixed motives into the *McDonnell Douglas* framework.

¶18 Laudert claims that because he presented direct evidence of discrimination, the trial court erred by not applying the analysis contained in *Reeves v. Dairy Queen, Inc.*, 1998 MT 13, 287 Mont. 196, 953 P.2d 703. Laudert observes that in *Reeves* we held that when discrimination is proven by direct evidence, the employer must prove by a preponderance of the evidence that an unlawful motive played no role in the challenged action or that the direct evidence of discrimination is not credible and is unworthy of belief. *See Reeves*, ¶ 17. RCSD contends that our holding in *Reeves* is not applicable to these facts because *Reeves* only pertains to instances in which the parties do not dispute the employer's reason for the challenged action. RCSD claims that the hearing examiner properly applied the "mixed motive" analysis described by the United States Supreme Court in *Price Waterhouse v. Hopkins* (1989), 490 U.S. 228, 109 S. Ct. 1775, 104 L. Ed. 2d 268.

¶19 Section 49-2-303(1), MCA, provides that "it is an unlawful discriminatory practice for . . . an employer to refuse employment to a person . . . because of . . . physical or mental disability." Similarly, § 49-4-101, MCA, provides that "[i]t is unlawful to discriminate, in hiring or employment, against a person because of the person's physical disability."

¶20 Claims of unlawful employment discrimination under the Montana Human Rights Act have typically been evaluated using the burden-shifting approach announced in *McDonnell Douglas. See, e.g., Hafner v. Conoco* (1994), 268 Mont. 396, 401, 886 P.2d 947, 950; *see also* Rule 24.9.610, ARM. Under this test, a person alleging discrimination must first demonstrate a prima facie case of discrimination. If the plaintiff proves a prima facie case by a preponderance of the evidence, the burden shifts to the employer to rebut the presumption of unlawful discrimination by producing a legitimate, nondiscriminatory reason for the action. Upon the employer's articulation of a lawful motive for the action, the burden shifts to the plaintiff to prove that the employer's proffered reason is only a pretext for unlawful discrimination. *See Reeves*, ¶ 12. Claims of employment discrimination analyzed under the *McDonnell Douglas* test are claims involving "circumstantial evidence" of unlawful discrimination or "pretext." *See Reeves*, ¶ 15.

¶21 However, in *Reeves* we held that the *McDonnell Douglas* burden-shifting approach was inappropriate for cases in which "the parties do not dispute the reason for the employer's action, but only whether such action is illegal discrimination." *Reeves,* ¶ 16. The plaintiff in *Reeves* received a reference letter from her former employer which stated that she had been fired because of "a combination of having high blood pressure and working in a position as a fast order cook working under conditions of pressure, stress and heat." *Reeves*, ¶ 7. We held that Reeves presented a case of "direct evidence" of discriminatory intent because the parties did not dispute the fact that Reeves' employer fired Reeves because of her high blood pressure. *Reeves,* ¶37.

¶22 The facts of the case *sub judice* do not fit neatly into either the *Reeves* approach or the *McDonnell Douglas* approach. Like the plaintiff in *Reeves*, the hearing examiner found that Laudert submitted "direct evidence" of RCSD's discriminatory intent. This finding makes the burden-shifting approach of *McDonnell Douglas* "inappropriate and unduly confusing." *Reeves*, ¶ 15. As the Supreme Court has held, the *McDonnell Douglas* test is inapplicable when plaintiffs present direct evidence of discrimination. *See Trans World Airlines, Inc. v. Thurston* (1985), 469 U.S. 111, 121, 105 S. Ct. 613, 621-22, 83 L. Ed. 2d 523. The Court observed that the shifting burdens of proof set forth in *McDonnell Douglas* were designed to assure that plaintiffs have their day in court "*despite the unavailability of direct evidence*." *Trans World Airlines*, 469 U.S. at 121, 105 S. Ct. at 621-22 (emphasis added); *see also Martinez v. Yellowstone County Welfare Dep't* (1981), 192 Mont. 42, 48, 626 P.2d 242, 245-46 (observing that one of the purposes of the *McDonnell Douglas* test is to ease the difficulty of bringing a claim of employment discrimination in the absence of direct evidence).

¶23 However, the *Reeves* approach is inappropriate as well, because unlike *Reeves,* the parties do not agree on the reason for the challenged action. Rather, RCSD's reason for not hiring Laudert is the determinative issue of this dispute. We observed in *Reeves* that assuming that the plaintiff is a member of a class protected by the statute, the determinative issue in a case in which the parties *do agree* on the reason for the challenged decision will not be the employer's intent, but instead in most cases will be whether the employee is "otherwise qualified" with or without reasonable accommodation, a factual dispute capable of resolution through traditional methods of proof. *Reeves*, ¶ 16.

¶24 In *Price Waterhouse* the United States Supreme Court addressed, for the first time, an employment discrimination claim in which a plaintiff presented direct evidence of discriminatory intent, but the parties *did not agree* on the reason for the challenged employment decision. The plaintiff, Ann Hopkins, a senior manager for Price Waterhouse, was denied partnership after the partners in her office submitted her name as a partner candidate. During the review of her candidacy for partnership, Price Waterhouse partners described Hopkins as "macho," suggested she "overcompensated for being a woman," and advised her to take "a course in charm school." *Price Waterhouse*, 490 U.S. at 235, 109 S. Ct. at 1782. In explaining to Hopkins what she could do to improve her chances of becoming a partner at Price Waterhouse, one partner advised her to "walk more femininely, talk more femininely, dress more femininely, wear make-up, have her hair styled, and wear jewelry." *Price Waterhouse*, 490 U.S. at 235, 109 S. Ct. at 1782. Hopkins filed a claim of unlawful employment discrimination on the basis of gender. Price Waterhouse contended that it denied Hopkins' bid for partnership because of her poor "interpersonal skills."

¶25 A majority of the court concluded that Hopkins had submitted sufficient evidence to prove that gender stereotyping was a motivating factor in Price Waterhouse's denial of partnership. A plurality of justices observed that "Hopkins proved that Price Waterhouse invited partners to submit comments; that some of the comments stemmed from [gender] stereotypes; that an important part of the Policy Board's decision on Hopkins was an assessment of the submitted comments; and that Price Waterhouse in no way disclaimed reliance on the [gender] linked evaluations." *Price Waterhouse*, 490 U.S. at 251, 109 S. Ct. at 1791. The plurality concluded that direct evidence that an unlawful consideration played a motivating role in an employment decision is sufficient to support a finding that the plaintiff was unlawfully discriminated against. *Price Waterhouse*, 490 U.S. at 241-42, 109 S. Ct. at 1786. However, the plurality held that an employer could avoid liability if it could prove the "affirmative defense" that it "would have made the same decision" in the

absence of the unlawful consideration. *Price Waterhouse*, 490 U.S. at 245-46, 109 S. Ct. at 1788.

¶26 In a concurring opinion, Justice O'Conner attempted to identify with more precision what evidence would constitute "direct evidence" of discrimination by describing what was *not* direct evidence: "stray remarks in the workplace," "statements by nondecisionmakers," or "statements by decisionmakers unrelated to the decisional process." *Price Waterhouse*, 490 U.S. at 277, 109 S. Ct. at 1804-05.

¶27 In *European Health Spa*, we observed that we had adopted the *McDonnell Douglas* test for employment discrimination cases which involve disparate treatment because the provisions of Title 49, of the Montana Human Rights Act, are closely modeled after Title VII of the Federal Civil Rights Act. *European Health Spa*, 212 Mont. at 325, 687 P.2d at 1032. For the same reason, we hereby adopt the analysis of *Price Waterhouse*. Accordingly, we will review the hearing examiner's decision to determine whether the hearing examiner correctly applied the "mixed motive" analysis contained in *Price Waterhouse*.

¶28 The hearing examiner correctly concluded that the "mixed motive" analysis applied. First, the hearing examiner found that Laudert had produced direct evidence that consideration of an illegal criterion, his liver condition, played a motivating role in RCSD's decision not to hire him. Thus, the *McDonnell Douglas* approach was inapplicable.

¶29 As in *Price Waterhouse*, the hearing examiner found that Laudert submitted evidence of statements made by a decision-maker and related to the decisional process being challenged which reflected an unlawful discriminatory attitude. The parties do not contest this finding. This finding was supported by the following facts. Deputy Glaeske, one of the four panelists who evaluated Laudert's interview, expressed his doubts regarding whether Laudert was physically capable of performing the job due to his disability, prior to Laudert's interview. Laudert brought up Glaeske's doubts during his interview. Despite having provided a full medical release, a discussion of Laudert's physical condition, medical history, and medication needs followed. The interviewers asked if Laudert could do the job and if Laudert could take a blow to the stomach. Laudert asked if his medical releases were in his job application file and provided another copy after the interview. Laudert estimated that 10 minutes of the 20- to 30-minute interview were spent discussing his physical condition.

¶30 Second, the parties did not agree on the reason RCSD refused to hire Laudert. Laudert claimed that he was not hired because of his disability; RCSD claimed that it did not hire Laudert because of his employment history. Thus, the *Reeves* approach was inapplicable.

¶31 We conclude that the hearing examiner correctly applied a "mixed motive" analysis. The District Court erred in applying the *McDonnell Douglas* approach to these facts.

## ISSUE TWO

¶32 Whether the District Court erred in affirming the hearing examiner's denial of Laudert's request for compensatory damages?

¶33 The hearing examiner required RCSD to prove by a preponderance of the evidence that unlawful consideration of Laudert's disability played no role in the challenged action in order to completely avoid liability. The hearing examiner found that RCSD failed to prove that its unlawful consideration of Laudert's disability played no part in the decision to hire another candidate. However, the hearing examiner also found that RCSD did prove by a preponderance of the evidence that it would not have hired Laudert regardless of his disability. As a result, the hearing examiner denied Laudert's request for compensatory damages. Both the commission and the District Court affirmed the denial of compensatory damages.

¶34 Laudert claims that pursuant to our holding in *Reeves* and a plain meaning interpretation of § 49-4-102, MCA, he should have been awarded compensatory damages and attorney fees once the hearing examiner found that RCSD failed to prove that unlawful consideration of Laudert's disability played no part in the decision not to hire him. In the alternative, Laudert contends that he is entitled to compensatory damages because the hearing examiner's finding that RCSD proved it would not have hired him even in the absence of his disability is clearly erroneous. RCSD contends that the hearing examiner correctly determined that Laudert had presented a mixed motive case and denied awarding compensatory damages to Laudert because RCSD proved that it would not have hired Laudert regardless of his disability. Neither party challenges the hearing examiner's order of equitable relief against RCSD.

¶35 Laudert's contention that he is entitled to compensatory damages pursuant to *Reeves* is without merit. *Reeves* is expressly limited to cases in which "the parties do not dispute the reason for the employer's action, but only whether such action is illegal discrimination."

*Reeves,* ¶ 16. Laudert and RCSD *do* dispute the reason for the challenged employment decision. Laudert claims that RCSD did not hire him because of his disability. RCSD contends that they did not hire Laudert because of his employment history.

¶36 Laudert's contention that he is entitled to compensatory damages pursuant to the "plain meaning" of § 49-4-102, MCA, is also without merit. Section 49-4-102, MCA, applies to civil actions brought in district court and not petitions for judicial review. Section 49-4-102, MCA, describes the "civil" remedy available in "a district court action." Section 49-4-102, MCA, also provides that "should the person who allegedly practiced discrimination prevail *in the civil action*, he shall be entitled to recover reasonable attorney's fees." (Emphasis added.) Laudert did not file an action in a district court for civil damages and attorney fees accrued as the result of an act of employment discrimination. Rather, he filed a petition for judicial review after his claim of employment discrimination was tried before a hearing examiner of the Montana Human Rights Commission. The statute which governs damage awards in employment discrimination cases heard before the Montana Human Rights Commission is § 49-2-506, MCA. *See Vainio v. Brookshire* (1993), 258 Mont. 273, 280, 852 P.2d 596, 601 ("Section 49-2-506(1)(b) delineates the forms of relief which the HRC may order if it finds that a person has engaged in unlawful discriminatory practices.").

¶37 Section 49-2-506, MCA, provides, in relevant part:

(1) If the commission or the department, after a hearing, finds that a party against whom a complaint was filed engaged in the discriminatory practice alleged in the complaint, the commission . . . *shall* order the party to refrain from engaging in the discriminatory conduct. The order *may*:

> (a) prescribe conditions on the accused's future conduct relevant to the type of discrimination found;
>
> (b) require any reasonable measure to correct the discriminatory practice and to rectify any harm, pecuniary or otherwise, to the person discriminated against;
>
> (c) require a report on the manner of compliance.

(Emphasis added.)

¶38 Whether the hearing examiner could award damages under this provision first depends on whether the examiner found that RCSD "engaged in the discriminatory practice alleged." Proof that an unlawful consideration played a motivating role in an adverse employment decision is sufficient to prove that an employer engaged in a discriminatory practice. *See Price Waterhouse*, 490 U.S. at 241-42, 109 S. Ct. at 1775. The issue then becomes whether, upon a finding of discrimination, the hearing examiner was required to award compensatory damages. The use of the word "shall" indicates that the commission must order a defendant to refrain from engaging in the discriminatory conduct upon a finding that the defendant engaged in the discriminatory practice alleged. *Cf. Montco v. Simonich* (1997), 285 Mont. 280, 287, 947 P.2d 1047, 1051 ("Both 'shall' and 'must' are mandatory, rather than permissive."). On the other hand, the commission's authority to award compensatory damages is discretionary. The use of the word "may" indicates that the commission has the discretion to award compensatory damages upon a finding that the defendant engaged in the discriminatory practice alleged. *Cf. Matter of Investigative Records of City of Columbus Police Dep't* (1995), 272 Mont. 486, 488, 901 P.2d 565, 567 (observing that the word "may" is permissive and therefore grants discretion).

¶39 The commission observes that it has adopted an administrative rule governing remedies in mixed motive cases. Rule 24.9.611, ARM, provides, in relevant part:

> When the charging party proves that the respondent engaged in unlawful discrimination or illegal retaliation, but the respondent proves the same action would have been taken in the absence of the unlawful discrimination or illegal retaliation, the case is a mixed motive case. In a mixed motive case . . . *the commission will not issue an order awarding compensation . . . .*

(Emphasis added.)

¶40 In sum, the hearing examiner found that RCSD had engaged in a discriminatory practice. The commission's authority to award compensatory damages upon a finding of discrimination is discretionary under § 49-2-506(1)(b), MCA. The commission has exercised its statutory authority to adopt Rule 24.9.611, ARM, limiting its discretion to award compensatory damages by precluding such awards in cases of mixed motives. *See* § 49-2-204, MCA. This limitation is consistent with the commission's statutory authority to adopt substantive rules necessary to implement its responsibilities under the Act and also comports with federal case law. *See Price Waterhouse*, 490 U.S. at 244-45, 109 S. Ct. 1787-88.

¶41 Accordingly, whether Laudert was entitled to compensatory damages depends on whether RCSD proved by a preponderance of the evidence that it would have made the same decision in the absence of Laudert's disability. *See* Rule 24.9.611, ARM; *see also Price Waterhouse*, 490 U.S. at 244-45, 109 S. Ct. 1787-88. The hearing examiner found that RCSD proved that Laudert would not have been hired in any event. There is substantial evidence to support this finding. As the hearing examiner observed, RCSD proved the existence of numerous legitimate reasons for preferring J.C. Rankin, the person RCSD hired, over Laudert. For instance, in 1987, while exiting the parking lot of the Triangle Nightclub southeast of Sidney, Montana, the vehicle Laudert was driving struck a vehicle driven by Kim Thiel. Mr. Thiel testified that he believed Laudert was drunk and he filed a complaint with RCSD. Laudert testified that he was issued a ticket for failure to yield the right-of-way and was suspended from work for three days. In 1990 Laudert was one of the subjects of sexual harassment complaints brought by two RCSD dispatchers. Lastly, Laudert indicated on his job application submitted in 1992 that he left the Sidney Police Department because he had "[l]ittle chance to use skills and training." Sheriff Tiffany of the RCSD testified that upon speaking with the Sidney Police Department, he discovered that Laudert was not truthful on his job application and that he had resigned from the Sidney Police Department because he was going to be terminated. These incidents are all legitimate reasons for deciding not to hire Laudert. The hearing examiner found that all four of the interview panelists were aware of at least some of these incidents before the hiring decision was made. Lastly, the hearing examiner found that Rankin, the person RCSD chose over Laudert, had a "clean" employment history.

¶42 We affirm the denial of Laudert's request for compensatory damages.

## ISSUE THREE

¶43 Whether the District Court erred in denying Laudert's claim for attorney fees?

¶44 Laudert asserts that due to the hearing examiner's finding that his physical disability played a role in RCSD's decision not to hire him and the hearing examiner's award of affirmative relief against RCSD, he was a "prevailing party" within the meaning of § 49-2-505(7), MCA. Therefore, Laudert contends that the District Court erred when it denied his request for attorney fees. Respondent Montana Human Rights Commission does not contest Laudert's claim that he is a prevailing party. The Montana Trial Lawyer's Association, who filed a brief as *amicus*, also agrees with Laudert's claim.

¶45 RCSD maintains that Laudert is not entitled to attorney fees under § 49-2-505(7), MCA, because he did not follow the appropriate procedure. It is RCSD's contention that the statute required Laudert to file an action for attorney fees in district court separate from his petition for judicial review. RCSD also argues that the District Court did not abuse its discretion in determining that Laudert was not a prevailing party.

¶46 As a preliminary matter, we reject RCSD's claim that Laudert is not entitled to attorney fees because he did not follow the appropriate procedure. As Laudert correctly observes, the issue of whether he followed the appropriate procedure in his action for attorney fees was raised below and rejected by the District Court in its Decision and Order. The District Court concluded that Laudert's claim for attorney fees under § 49-2-505(7), MCA, was properly before the court and that requiring Laudert to file a separate action for attorney fees would serve no purpose. "Although Rule 14 [M.R.App.P.] provides for review of matters by cross-assignment of error, this does not eliminate the necessity for cross-appeal by a respondent who seeks review of rulings on matters separate and distinct from those sought to be reviewed by the appellant." *Johnson v. Tindall* (1981), 195 Mont. 165, 169, 635 P.2d 266, 268; *accord Marco and Co., LLC v. Deaconess/ Billings Clinic Health Sys.*, 1998 MT 26, ¶ 13, 287 Mont. 293, ¶ 13, 954 P.2d 1116, ¶ 13. The issue of whether the District Court erred by determining that Laudert was not a prevailing party is separate and distinct from the issue of whether the District Court erred by determining that Laudert followed the appropriate procedure in maintaining his request for attorney fees. Accordingly, we conclude that a cross-appeal is necessary for our review of the additional issue presented by RCSD. Because no cross-appeal was filed, we will not address this issue.

¶47 In regard to Laudert's claim for attorney fees, the District Court concluded:

> Although Laudert prevailed to the extent that the Human Rights Commission held that he was discriminated against on the basis of a disability, he *did not prevail on the ultimate basis for his petition*. He was awarded no damages or other relief. To that extent, the Sheriff's Department prevailed. For these reasons, the Court declines to award attorney fees.

(Emphasis added.)

¶48 A district court's award of attorney fees to a prevailing party in a contested case hearing is governed by § 49-2-505(7), MCA, which provides that "[t]he court in its

discretion may allow the prevailing party reasonable attorney fees." We review a district court's decision to award or deny attorney fees under § 49-2-505, MCA, to determine whether the court abused its discretion. *See McCann v. Trustees, Dodson School Dist.* (1991), 249 Mont. 362, 364, 816 P.2d 435, 436. We review any legal conclusions reached in deciding upon a request for a statutory fee award to determine whether they are correct. *See Ihler v. Chisholm*, 2000 MT 37, ¶ 24, 995 P.2d 439, ¶ 24, 57 St.Rep. 163, ¶ 24.

¶49 As we have previously stated, the Montana Human Rights Act is closely modeled after Title VII, and reference to pertinent federal case law is both useful and appropriate. *See McCann*, 249 Mont. at 364, 816 P.2d at 437. In *Wagner v. Empire Development Corp.* (1987), 228 Mont 370, 743 P.2d 586, we referred to federal decisions interpreting 42 U.S. C. § 1988 for assistance in construing § 49-2-505(7), MCA. Under § 1988, a prevailing plaintiff should ordinarily recover an attorney's fee "unless special circumstances would render such an award unjust." *Hensley v. Eckerhart* (1983), 461 U.S. 424, 429, 103 S. Ct. 1933, 1937, 76 L. Ed. 2d 40, 48. However, before attorney fees can be granted, a court must determine whether the plaintiff prevailed. *See Hensley*, 461 U.S. at 434, 103 S. Ct. at 1939.

¶50 In *Texas State Teachers Association v. Garland Independent School District* (1989), 489 U.S. 782, 109 S. Ct. 1486, 103 L. Ed. 2d 866, the Supreme Court resolved a split among the Federal Circuit Courts of Appeal concerning the definition of "prevailing" plaintiff. Some federal appeals courts had required that a party succeed on the "central issue" in the litigation and achieve the "primary relief sought" in order to be eligible for fees as a prevailing party, while other courts had applied a less demanding standard, requiring only that a party succeed on a "significant issue" and receive "some of the relief sought." *Garland*, 489 U.S. at 784, 109 S. Ct. 1489. The Supreme Court rejected the "central issue test," observing that it was not only contrary to congressional intent, but also that it would be difficult to administer because answers to the question of the "central issue" and the "primary relief sought" in a dispute appeared to depend largely on the mental state of the parties in bringing the suit. *Garland*, 489 U.S. at 791, 109 S. Ct. at 1493. The Court stated that a prevailing party is one who has succeeded on any significant issue in litigation which achieved some of the benefit the party sought in bringing suit. In this regard, the Court declared that "the touchstone of the prevailing party inquiry must be the material alteration of the legal relationship of the parties in a manner which Congress sought to promote in the fee statute." *Garland*, 489 U.S. at 792-93, 109 S. Ct. at 1494.

¶51 The District Court erred by concluding that Laudert did not prevail because he did not

prevail on the "ultimate basis for his petition." That type of analysis was expressly repudiated by the Supreme Court in *Garland* when it rejected the "central issue" and "primary relief sought" tests under § 1988. We believe that requiring that a plaintiff prevail on the "ultimate basis" is an inappropriate test for purposes of § 49-2-505(7), MCA. This type of analysis distracts trial courts from the primary purposes behind the fee shifting provisions of the Montana Human Rights Act, namely, ensuring "effective access to the judicial process" and encouraging "meritorious civil rights litigation." *Wagner*, 228 Mont. at 372, 743 P.2d at 587 (quoting *Hensley*, 461 U.S. at 429 n.2, 102 S. Ct. at 1937 n.2); *cf. Garland*, 489 U.S. at 791, 109 S. Ct. at 1493.

¶52 However, the issue of whether Laudert prevailed remains. In *Farrar v. Hobby* (1992), 506 U.S. 103, 113 S. Ct. 566, 121 L. Ed. 2d 494, the Court further refined the definition of prevailing party for purposes of § 1988. The appellants in *Farrar* succeeded in securing a jury finding that their civil rights had been violated by the defendant, but the jury also found that this violation was not the proximate cause of their damages. The plaintiffs received an award of nominal damages in the amount of one dollar. The Court concluded that, in order to prevail for purposes of § 1988, a plaintiff:

> [M]ust obtain an enforceable judgement against the defendant from whom fees are sought . . . or comparable relief through a consent decree or settlement. Whatever relief the plaintiff secures must directly benefit him at the time of the judgment or settlement. Otherwise, the judgment or settlement cannot be said to "affec[t] the behavior of the defendant toward the plaintiff." . . . In short, a plaintiff "prevails" when actual relief on the merits of [the plaintiff's] claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff.

*Farrar*, 506 U.S. at 111-12, 113 S. Ct. at 573 (citations omitted).[1] *The Court held that the plaintiffs had prevailed because the award of nominal damages "modifies the defendant's behavior for the plaintiff's benefit by forcing the defendant to pay an amount of money he otherwise would not pay."* Farrar, 506 U.S. at 113, 113 S. Ct. at 574.

¶53 Under *Farrar*, the determination of whether Laudert prevailed would depend on whether the judgment he received materially altered the legal relationship between the parties by modifying RCSD's behavior in a way that directly benefited Laudert. The hearing examiner required RCSD to submit a written policy regarding hiring procedures which included specific guidelines regarding future inquiry into applicant disabilities. This order of affirmative injunctive relief clearly modified RCSD's behavior. The remaining

issue is whether Laudert directly benefited from this modification.

¶54 The decisions referred to by the parties and *amicus* to aid us in determining whether Laudert prevailed are unavailing. Many of the decisions are factually distinct in that the plaintiff clearly prevailed under *Farrar* because the plaintiff received a direct personal benefit from a decision on the merits of the plaintiff's claim, *see LeBlanc-Sternberg v. Fletcher* (2d Cir. 1998), 143 F.3d 748, 758 (plaintiff awarded nominal damages); *Brandau v. Kansas* (10th Cir. 1999), 168 F.3d 1179, 1181 (nominal damages); *Hashimoto v. Dalton* (9th Cir. 1997), 118 F.3d 671, 677 (defendant directed to remove negative character reference from plaintiff's personnel file); *Roe v. Cheyenne Mountain Conference Resort, Inc.* (10th Cir. 1997), 124 F.3d 1221, 1231 (observing that there was no doubt that the plaintiff's suit would affect the behavior of the defendant toward the plaintiff), or the plaintiff did not receive an enforceable judgment on the merits, *see Baumgartner*, 21 F.3d at 544, or the attorney fee issue was decided pursuant to a federal statute which does not require a court to determine whether a party prevailed before granting attorney fees,[2] *see, e.g., Gudenkauf v. Stauffer Communications, Inc.* (10th Cir. 1998), 158 F.3d 1074, 1080 (issue of award of attorney fees decided under 42 U.S.C. § 2000e).

¶55 *Amicus* argues that Laudert directly benefited from the hearing examiner's order because he might seek employment with RCSD in the future and, if so, would directly benefit from RCSD's court-ordered antidiscrimination policy. This potential benefit is not the type of direct personal benefit that would allow a court to conclude that a plaintiff "prevailed" under federal law. Under § 1988, "whatever relief the plaintiff secures must directly benefit him at the time of the judgment or settlement." *Farrar*, 506 U.S. at 111, 113 S. Ct. at 573.

¶56 We found the Supreme Court's analysis in *Garland* "useful and appropriate" in interpreting § 49-2-505(7), MCA, because it furthered the primary purposes behind this fee shifting provision. By the same token, we reject the Supreme Court's requirement that a plaintiff secure a direct benefit at the time judgment is entered in order to be a prevailing party because this requirement would not further the purpose of awarding attorney fees in civil rights cases brought under the Montana Human Rights Act. As we stated in *Wagner*, one of the purposes of § 49-2-505(7), MCA, is to encourage the filing of "meritorious civil rights litigation." *Wagner*, 228 Mont. at 372, 743 P.2d at 587 (observing that "without an attorney's fee award for successful litigants, meritorious civil rights litigation often would not be brought"). Complaints of civil rights abuses which are successful in establishing a finding of discrimination and an order of injunctive relief requiring an employer to

establish nondiscriminatory hiring guidelines are certainly the type of meritorious civil rights litigation that should be encouraged. "Title 49 clearly depicts the intent of the legislature . . . [that] [t]here shall be no discrimination in certain areas of the lives of Montana citizens, employment being one such area, except under the most limited of circumstances." *Dolan v. School Dist. #10* (1981), 195 Mont. 340, 347, 636 P.2d 825, 829.

¶ 57 For the same reasons, we also reject RCSD's suggestion that although Laudert may have prevailed, he is nonetheless not entitled to an award of fees because his victory was purely "technical" or "de minimis." *See Farrar*, 506 U.S. at 114, 113 S. Ct. at 574. The injunctive order requiring RCSD to establish non-discriminatory hiring practices provides the public with a measure of protection from future civil rights violations by RCSD. As *amicus* notes, as a result of the enforcement provisions of Montana's Human Rights Act, private individuals such as Laudert play a key role in assuring compliance by private and public entities with the requirements of the Act. In that role, they serve not only their own private interests in seeking recovery for their injuries, but also the broader public interest of eliminating "discrimination in certain areas of the lives of Montana citizens." *Dolan*, 195 Mont. at 347, 636 P.2d at 829. To conclude that although Laudert prevailed, he is nonetheless not entitled to fees because his success was purely "technical" would serve to discourage the elimination of unlawful discrimination in employment.

¶58 For the forgoing reasons, we conclude that the District Court's determination that Laudert did not prevail because RCSD proved that it would have made the same decision despite its consideration of Laudert's disability is in error. We remand to the District Court to determine a reasonable fee award pursuant to § 49-2-505(7), MCA.

¶59 Affirmed in part, reversed in part, and remanded for proceedings consistent with this opinion.

/S/ JIM REGNIER

We Concur:

/S/ J. A. TURNAGE

/S/ WILLIAM E. HUNT, SR.

/S/ JAMES C. NELSON

Justice Karla M. Gray, concurring in part and dissenting in part.

¶60 I concur in the Court's opinion on issues one and two. I respectfully dissent from that opinion on issue three, namely, whether the District Court erred in denying attorney fees to Laudert. While I agree that the trial court erred in using the "ultimate basis" test in determining whether Laudert is the prevailing party, I would affirm its denial of attorney fees under the "right result, wrong reason" approach, relying on the "useful and appropriate"--and, I submit, persuasive--federal authorities cited by the Court.

¶61 We all agree that § 49-2-505(7), MCA, vests discretion in the district courts to award reasonable attorney fees to the prevailing party in a discrimination action. Thus, our inquiry is whether Laudert is the prevailing party in this action. We also apparently agree that federal case law is useful and appropriate in interpreting the Montana Human Rights Act (Montana Act) and that, as a logical next step, the United States Supreme Court's articulation of the "prevailing party" standard in *Garland* is the appropriate test. Under that test, "the touchstone of the prevailing party inquiry must be the material alteration of the legal relationship of the parties . . . ." *Garland*, 489 U.S. at 792-93, 109 S.Ct. at 1494.

¶62 It is true, as the Court observes, that the Supreme Court further refined the prevailing party test in *Farrar*. In doing so, however, the Supreme Court left untouched the fundamental basis of that test as expressed in *Garland*. Notwithstanding the addition of the "enforceable judgment . . . or comparable relief" language, the focal point of the prevailing party test still centers on relief that materially alters the legal relationship between the parties. *Farrar*, 506 U.S. at 111, 113 S.Ct. at 573 (citing *Garland*, 489 U.S. at 792-93, 109 S.Ct. at 1494). Indeed, the rationale for adding the "enforceable judgment or comparable relief" refinement in *Farrar* is merely a matter of logic and common sense because, absent such judgment or relief, there can be no material alteration in the *legal relationship* between the parties.

¶63 In the present case, it is undisputed that the relief granted--that is, required changes in the RCSD's policy on hiring procedures--does not affect the legal relationship between Laudert and the RCSD in any fashion. On that basis, and because our practice is to use federal authority in interpreting the Montana Act, I would conclude that Laudert was not the prevailing party for purposes of the District Court's discretionary authority to award attorney fees under § 49-2-505(7), MCA.

¶64 Instead of doing so, the Court abruptly switches horses in midstream by rejecting the

*Farrar* prevailing party standard--which includes the core *Garland* concept of a material alteration in the legal relationship between the parties--and saddling up a new pony which, as it candidly admits, is not supported by any federal authority cited by any party or, indeed, by the Court. Under this new approach to the Montana Act, civil rights plaintiffs become, in essence, private attorneys general who serve the public good by eliminating discrimination, even if the one established discriminatory act--here, an act which began as a discussion of Laudert's past medical problems initiated by Laudert himself--does not produce a result adverse to the plaintiff or any other person. In the abstract, this is assuredly a noble and sound result. The problem is that such a result is not supported by the language of the Montana Act or any other legal authority. Moreover, the Court's decision to depart from our practice of relying on federal authority in interpreting the Montana Act and, instead, to pick and choose when and to what extent it will do so, leaves legal practitioners and trial courts without any guidance in this important area of the law.

¶65 Nor does the Court address the fact that, once a hearing examiner or the Commission finds a discriminatory practice or conduct has occurred, it is required to order the party to refrain from engaging in that conduct and prescribe conditions on such future conduct which are relevant to the type of discriminatory practice found, without regard to whether the plaintiff establishes that the practice or conduct resulted in his or her failure to obtain the job at issue. *See* § 49-2-506, MCA. Under the Court's approach to the prevailing party standard, then, every plaintiff who establishes a single discriminatory act necessarily will be a prevailing party for purposes of the discretionary award of attorney fees authorized by § 49-2-505(7), MCA. Nothing in the language of the Montana Act supports such a result.

¶66 The Court cites to our *Wagner* and *Dolan* decisions as support for its "public service" approach to the prevailing party inquiry. Neither case is relevant here. In *Wagner*, the plaintiff's prevailing party status was undisputed and the issue was whether the trial court abused its discretion in denying attorney fees. *Wagner*, 228 Mont. at 371-72, 743 P.2d at 587. In that context, we cited to a United States Supreme Court case for the proposition that "[t]he purpose of awarding attorney's fees to prevailing parties in civil rights litigation is to ensure 'effective access to the judicial process[,]' " and went on to state that "[g] enerally, there is agreement that without an attorney's fee award for successful litigants, meritorious civil rights litigation often would not be brought." *Wagner*, 228 Mont. at 372, 743 P.2d at 587. The Court is simply in error in relying on our statements in *Wagner* as the basis for its prevailing party determination, an issue not addressed there and to which the quoted statements bear no relationship. Indeed, the Court's use of those statements--which presumed the existence of a prevailing party--to support its prevailing party determination

is a matter of the tail wagging the dog.

¶67 Nor is *Dolan* applicable here. There, the issue before us was whether Title 49 impliedly repealed an older statute which permitted a school district to mandatorily retire a teacher at age 65. *See Dolan*, 195 Mont. at 342, 636 P.2d at 826. We held that it did, because the earlier statute permitted discrimination in employment based *solely* on age, whereas the subsequently enacted "Title 49 clearly depicts the intent of the legislature[,] [that] [t]here shall be *no* discrimination in certain areas of the lives of Montana citizens, employment being one such area, except under the most limited of circumstances." *Dolan*, 195 Mont. at 347, 636 P.2d at 829. Unlike the case presently before us, *Dolan* did not involve a prevailing party inquiry and our statements therein have no bearing on that issue here.

¶68 As a consequence of the lack of support in the Montana Act, our case law or federal authorities for a contrary result, I conclude that Laudert is not the prevailing party for purposes of an award of attorney fees under § 49-2-505(7), MCA. On that basis, I would affirm the District Court's denial of attorney fees and I respectfully dissent from the Court's failure to do so.

/S/ KARLA M. GRAY

1. Despite the apparently exclusive language in *Farrar* which seems to indicate that a plaintiff must secure an "enforceable judgment" or "comparable relief through a consent decree or settlement," most Federal Courts of Appeal have held that a plaintiff can be a prevailing party even if the plaintiff does not obtain relief on the merits or through a settlement. *See, e.g., Baumgartner v. Harrisburg Housing Auth.* (3d Cir. 1994), 21 F.3d 541. Under this so-called "catalyst" theory, a plaintiff who can prove that the existence of the lawsuit accomplished the original objectives of the lawsuit without a formal judgment can be a prevailing party. *Baumgartner*, 21 F.3d at 544.

2. After the *Price Waterhouse* decision, Congress enacted the Civil Rights Act of 1991. The Act provides that a court "may grant . . . attorney fees" to a plaintiff who proves that an impermissible factor was a motivating factor in an employment decision. 42 U.S.C. § 2000e-5(g)(2)(B)(i); *see also Tyler v. Bethlehem Steel Corp.* (2d Cir. 1992), 958 F.2d 1176, 1181-82. Cases decided under § 2000e-5(g)(2)(B)(i) do not address the prevailing party issue because, unlike fee shifting statutes such as § 1988 which provide that a court may only grant fees to a "prevailing" party, this provision does not require that threshold determination. The Montana Legislature has not enacted similar provisions governing attorney fee awards in mixed motive cases brought under the Montana Human Rights Act. Absent legislative direction, we are hesitant to engraft these federal provisions onto Montana civil rights law. Accordingly, under Montana law a district court must still determine whether the plaintiff prevailed in the contested case hearing before it can award attorney fees. *See* § 49-2-505(7), MCA.